### Application of CENTRAL FLORIDA GAS CORPORATION.
Docket No. 71365-GU. Order No. 5291.

Florida Public Service Commission.

December 30, 1971.

B. Kenneth Gatlin, Tallahassee, for the applicant.

Harry D. Boswell and Prentice P. Pruitt, for the commission staff and the public generally.

Chairman JESS YARBOROUGH and Commissioners WILLIAM T. MAYO and WILLIAM H. BEVIS participated in the disposition of the matter.

BY THE COMMISSION.

*Order authorizing interim increase under bond:* On August 2, 1971 Central Florida Gas Corporation filed its application seeking an emergency interim increase in rates under bond until such time as an increase on a permanent basis could be acted on. A public hearing was held in Winter Haven on October 19, 1971, on the request for a temporary increase and the commission is now ready to enter its decision.

In its petition filed August 2, 1971, the company alleges that it would have an operating loss of $12,760 before payment of interest based on a pro forma test year ended December 31, 1970, with a projection of various costs and expenses.

In projecting their revenue if the proposed rates are authorized, the company calculated that total operating revenues would be increased by $197,353 using an updated June 30, 1971 test period. Of this, $45,347 represents an amount that would be derived from the application of the purchased gas adjustment clause which is presently being applied in certain instances and we will delete any consideration of it in arriving at how much additional revenue the company should be authorized. However, the company is not presently applying the purchased gas adjustment clause to certain general services schedules customers even though permitted to do so under their current tariff. We have determined that this would produce $9,283 of additional revenue if appropriately applied and we think it should be.

The company is also requesting that its turn-on charge be increased to $5 and that its turn-off charge applying to all customers regardless of their length of service be increased to $3. These charges would produce additional revenues of $9,723 on an annual basis if authorized. While we believe the present turn-on charge of $1.50 is too low, we cannot approve a $5 charge but we think a $4 turn-on charge will enable the company to cover the costs associated with turn-ons and is more in line with what we have previously found to be reasonable. We think that the $3 turn-off charge is just and reasonable when its application is restricted to customers of less than twelve months continuous service and we so find. We have determined that these charges would produce estimated additional annual revenue of $7,723.

In its application, the company alleges that if the proposed rates are allowed to go into effect, it will still only be earning a 5.79% return on its year-end book cost rate base. However, we have made certain adjustments to the rate base as well as to the net operating income which are discussed below increasing the rate of return to 8.70%.

## The rate base

The company has proposed the use of a year-end rate base. However, we have determined that the company's growth in both plant-in-service and number of customers does not represent extraordinary growth and therefore does not justify the use of a year-end rate base. We accordingly find that the use of an average rate base is appropriate at this time requiring an adjustment of $34,657 net of depreciation to be made to the company's year-end rate base.

After inspection by members of our engineering staff, we have determined that the plant-in-service as shown by the company contains items which are not used in their natural gas operation and accordingly should be removed from the rate base. These plant items total $125,149 with a corresponding adjustment to the depreciation reserve of $86,076. Minimum bank balances as included in the company's rate base have been reduced by $80,000 to reflect the commission's usual practice of allowing $10,000 per bank. Since a condemnation of the company's property within the city limits by the city of Bartow is presently pending and appears imminent we have made an adjustment to the rate base to reflect this loss. The company's exhibit 15 (revised) shows that this property comprises 10.2% of the company's total property; therefore adjustments of $124,201 and $33,208 have been made to Plant-In-Service and Accumulated Depreciation respectively. Adjustments to the cash working capital allowance have been made in the amount of $6,163 representing 1/8 of operating expense adjustments subject to cash outlay and applying a $9,939 tax lag applicable to federal income tax expense after the increase is put into effect, will result in an adjusted rate base of $1,117,779.

## Net operating income and earned rate of return

The adjusted rate base as discussed above was adjusted to exclude the probable loss of the Bartow system, therefore net operating income has also been adjusted resulting in a net operating loss for the 12 months ending June 30, 1971 of $52,478. This represents the point from which staff adjustments were made. In preparing its pro forma statement, the company projected costs of which only a portion had occured during the test year or were predicated on events which had not happened. Therefore we have reduced the amounts estimated for new safety standards by $13,786; highway relocation by $22,500; and payroll increases by $11,333. While we recognize that the company will have to increase its salaries in order to retain employees and stop the high turn-over rate, we have applied the 5.5% increase limitation as prescribed by the wage board. Also the company pro-formed payroll increases effective

June 1, 1971. Since the test period ended June 30, 1971, one month of this increase was included in operations necessitating an adjustment of $1,636. Taxes other than income applicable to the above payroll increases were adjusted by $674. Increased postage expense had been adjusted to recognize the amount actually incurred during the test period, or $54. Conversion costs of $7,593 which will be completely amortized by the end of 1971 have been eliminated. Depreciation expense applicable to the engineering department adjustments were made totaling $1,846. The above adjustments total $59,422 resulting in adjusted net operating income of $6,944 for the test year. After allowing for taxes and utility assessments, the staff has determined that the company would show adjusted net operating income of $97,282 on a pro forma basis including the effects of the proposed increase and as adjusted above.

In relating the adjusted net operating income to the rate base, we find the rate of return to be 8.70%. Considering the risk involved, we do not find this rate of return to be unreasonable at this time. However, we feel that the company should pursue a policy of obtaining a realistic capital structure that will more readily display the cost of capital.

We think the company has presented sufficient testimony and exhibits on which we have made our finding for a temporary emergency increase. However we think we would be amiss in our responsibility if we did not point out that the company stands in need of major updating of its books and records so that its plant-in-service account will truly and accurately reflect the property which the company is using in its natural gas operations. We are therefore making a requirement of this order and subject to the bond which we will require that the company make a plant-in-service study so that the property records will accurately depict the property used and useful in their natural gas operations reflecting all additions and retirements that have been made or should have been made and the related depreciation. It is imperative that a regulated utility maintain accurate records which are in conformance with the uniform system of accounts prescribed by this commission. This will facilitate the filing of proper annual reports by the company and the making of commission staff audits.

As we have said above, the hearing held on October 19 and this order are solely concerned with the granting of a temporary increase under bond with a subsequent hearing to be held on the permanent application. In order to get the full effect of the temporary increase we are granting in this order and so that the question of the Bartow properties condemnation suit will likely be finalized, we are setting a test year ending December 31, 1972, for the permanent application.

## Bond requirements

As we have previously stated, we will permit Central Florida Gas to increase its rates and charges as authorized herein on an emergency temporary basis on the condition that Central Florida Gas post a good and sufficient bond to guarantee appropriate refund to its customers in the event this commission should subsequently determine that the company's rate of return is excessive. We are also requiring as a condition of this bond that the company have a complete plant-in-service study made so that Central Florida Gas's plant records will accurately show the property used in the natural gas operation and the correct depreciation related thereto. We have determined above that the company should receive $142,348 as a result of the increases authorized herein and we find that the amount of the bond should be $150,000. We have set the twelve months ending December 31, 1972, as the test period for the determination of whether a permanent increase should be granted and a hearing will be scheduled subsequent to that date to determine a fair rate of return for the company and a review of the rates authorized in this order will be made to determine the fairness and reasonableness of those rates. The condition of this bond shall be that the company will promptly refund to its customers, as directed by the commission, such excess earnings, if any, as the commission may determine as a result of said review.

## Economic Stabilization Program

By executive order 11627 dated October 15, 1971, the President implemented phase II of the Wage-Price Control Program pursuant to the Economic Stabilization Act, as amended, creating the Cost of Living Council and the Price Commission which have promulgated certain rules, regulations and guidelines related to the rates which public utilities may charge. We have reviewed these rules, regulations, and guidelines related to the increase authorized herein and we find that said increase is consistent with the purposes of the Economic Stabilization Act, which are to stabilize the economy, reduce inflation, and minimize unemployment and the guidelines of the Price Commission, in that —

1. The increase will not contribute to inflationary expectations.
2. The increase has been reduced to reflect productivity gains.
3. The increase is the minimum rate required to assure continued adequate service.
4. The increase in the rate of return above previously allowed level is necessary to assure continued adequate service and provide for necessary expansion to meet future requirements; and that it is the minimum rate of return needed to attract capital.

Now, therefore, in consideration thereof, it is ordered that each of the specific findings set forth herein be and the same are hereby approved in every respect.

It is further ordered that Central Florida Gas Corporation be and hereby is authorized to increase its rates and charges as proposed except the turn-on charge may be increased to $4 rather than the $5 proposed and the turn-off charge may be increased to $3 restricted to those customers with less than twelve months continuous service. These rates and charges should produce additional gross revenue of $142,348 on an annual basis resulting in a return in the area of 8.70% on an average original cost rate base of $1,127,718. The company should file appropriate tariffs consistent with this order which may be placed into effect upon a subsequent date to be certified by this commission.

It is further ordered that Central Florida Gas Corporation file with the commission for its approval, a good and sufficient bond in the principal amount of $150,000 in conformity with the finding herein and consistent with the purpose and conditions specified in this order.

It is further ordered that Central Florida Gas Corporation perform an outside plant inventory and adjust its records accordingly so that its plant-in-service accounts will accurately reflect the property which is used and useful in serving its natural gas customers.

It is further ordered that the company file all of the minimum filing requirements on a test period ended December 31, 1972 on or before March 31, 1973 so as to permit the commission to set a hearing on the permanent rate increase as soon as practical thereafter.

It is further ordered that the commission hereby certifies that it has reviewed the increases herein with regard to their consistency with the purposes of the Economic Stabilization Act of 1970, as amended, and that such increases are consistent with said purposes.

It is further ordered that Central Florida Gas Corporation shall assume the responsibility of complying with the rules and regulations of the Price Commission and shall notify this commission of any stay in the effectiveness of this order.

By order of Chairman JESS YARBOROUGH, Commissioner WILLIAM T. MAYO and Commissioner WILLIAM H. BEVIS, as and constituting the Florida Public Service Commission, this 30th day of December, 1971.

*William B. DeMilly*
Administrative Secretary